UNITED STATES DISTRICT COURT

MIDDLE DISTRICT OF LOUISIANA

LYNN WOODS                                                                                          CIVIL ACTION

VERSUS                                                                            15-399-SDD-RLB

BOARD OF SUPERVISORS
OF UNIVERSITY OF
LOUISIANA SYSTEM
NORTHWESTERN STATE
UNIVERSITY

**RULING**

This matter is before the Court on the *Motion for Summary Judgement*[1] filed by Defendant, the Board of Supervisors of the University of Louisiana System, Northwestern State University ("NSU" or "Defendant"). Plaintiff, Lynn Woods, ("Woods") has filed an *Opposition*[2] to this motion, to which Defendant filed a *Reply*.[3] For the following reasons, the motion will be granted.

**I.  FACTUAL BACKGROUND**[4]

Woods filed suit against NSU for violations of "Section 504 of the Rehabilitation Act of 1973, 29 U.S.C. § 794."[5] Woods was diagnosed with Meniere's disease[6] around 2009. On March 23, 2013, Woods informed her supervisor, Dr. Pierson ("Pierson"), that

---

[1] Rec. Doc. 18.
[2] Rec. Doc. 20.
[3] Rec. Doc. 21.
[4] The Court draws the factual background from the following documents: Rec. Doc. 1, 18-1,18-4, 18-7, 20, and Rec. Doc. 21.
[5] Rec. Doc. 1.
[6] "Meniere's disease is a recurring condition with the symptoms of hearing loss, tinnitus, dizziness, and nausea."  *Allen v. UNUM Life Ins. Co. of America*, 142 Fed. Appx. 907, 909 (6th Cir. 2005).
37377

she would need to have medical test performed during the Fall 2013 semester, and she may not know the results of these tests until Spring of 2014. Woods also told Pierson that she intended to teach all her classes online for the Fall 2013 semester to pursue treatment for Meniere's disease. Woods provided no medical records or documentation specifying the type of testing or treatment she would be receiving.

The department originally allowed Woods to convert her teaching schedule for the Fall 2013 schedule to be solely online. Following student complaints, Dr. Lisa Abney ("Abney"), the Provost and Vice-President for Academic Affairs, directed Pierson to convert the classes from online to face-to-face. On April 22, 2013, Woods was notified of numerous student complaints that all of her classes for the Hospitality Management and Tourism Program ("HMT") would be taught online. Woods responded on April 23, 2013:

> Here are the options:
> a.  Convert all of the HMT classes to on-line for fall
> b.  I take sick leave and an adjunct is hired to teach the classes. Considering that I have enough sick leave built up to take sick leave for the next 2 years … that would be fine with me.
> c.  Administration insists on having only face-to face classes now and will not hire someone else to teach them. Therefore, we just put it on the schedule, and I can "call in sick" for the entire semester.
> Please advise.[7]

Abney responded that "we would like to have online offerings in your program but not to the complete exclusion of FTF [face-to-face] courses."[8] Abney also offered the

---

[7] Rec. Doc. 18-2, p. 17.
[8] *Id.* at p. 18.
37377

following solution: "Should your tests require you to be gone from class, I am sure that [Pierson] will work with you to teach them via Webex or online in order to keep the students on schedule during the period that you cannot come to campus."[9]  Instead of accepting this hybrid approach of both face-to-face teaching and online classes, Woods elected to take sick leave for the Fall 2013 semester.

On or about the first or second day of the Spring 2014 semester, Woods went to the office of Connie Jones ("Jones"), the Coordinator for Family and Consumer Sciences Division and HMT Program, and stated "that she was going to teach her classes for three weeks and then put them online."[10]  Jones responded that offering the HMT classes online was not a workable solution for the department but that she "would work with her, you know, when she needed to be in Dallas or Houston [for treatment]."[11]  In a letter dated January 13, 2014, Abney offered Woods the hybrid face-to-face and online teaching format: "The idea behind this was that you could be here advising and recruiting/retention work along with teaching during the semester and that you would be covering your classes via WebEx/Moodle only during the periods of treatment when you are off-site."[12] Abney also requested "verification from your doctor no later than January 31, 2014, outlining your course of treatment, expected dates of delivery or treatment and anticipated dates of return to campus afterward."[13]  Woods responded: "I am prepared to continue here through January getting classes ready for switching to on-line OR canceling all classes and going on sick leave for this spring 2014 semester."[14]

---

[9] *Id.*
[10] Rec. Doc. 18-5, p. 3, Lines 4-7.
[11] *Id.* at p. 4, Lines 19-21.
[12] Rec. Doc. 18-2, p. 7.
[13] *Id.*
[14] *Id* at p. 10.
37377

On January 21, 2014, Abney responded to Woods' response with the following:

> At this time, we cannot grant you permission to convert your face-to-face course to online format. The initial proposal was that you teach online when temporarily away for treatment. The bulk of your classroom interaction needs to be face to face as your program is not approved to be delivered electronically, and since you are the only full-time faculty member working in your concentration, we need you to service our on-campus students."[15]

Woods decided to cancel her face-to-face classes for Spring 2014, but she continued to teach her online class for the Spring 2014 semester. On January 22, 2014, Woods provided Abney with a note from her primary care physician, Dr. Kathleen Kautz ("Kautz"), which stated that Woods "would benefit medically from hybrid teaching, part classroom and part online,"[16] but did not provide any information on the testing and treatment Woods would be receiving for Meniere's disease despite Abney's request.

On August 19, 2014, Woods provided a note from Dr. George W. Blair-West ("Blair-West"), a psychiatrist in Australia who stated that Woods "needed to remove herself from her environment and we will undertake trauma therapy (Eye Movement [*sic*] Desensitisation and Reprocessing – EMDR) and relationship therapy. The time required for this is such that I would not see her as likely to return for the current semester."[17] On July 24, 2015, Woods provided a note from Blair-West stating that Woods was fit to return to work. Since 2015, Woods has been teaching face-to-face courses at NSU without any accommodation.

---

[15] Rec. Doc. 18-2, p. 11.
[16] *Id.* at p. 14.
[17] Rec. Doc. 18-1, p. 6.
37377

Plaintiff filed this suit alleging that NSU violated Section 504 of the Rehabilitation Act of 1973 alleging NSU has refused to engage in an interactive process with Woods to determine an accommodation, and NSU has refused to provide Woods a reasonable accommodation for her disability.  NSU now moves for summary judgment.

## II.   LAW AND ANALYSIS

### A. Summary Judgment Standard

"The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."[18]  "When assessing whether a dispute to any material fact exists, we consider all of the evidence in the record but refrain from making credibility determinations or weighing the evidence."[19]  A party moving for summary judgment "must 'demonstrate the absence of a genuine issue of material fact,' but need not negate the elements of the nonmovant's case."[20]  If the moving party satisfies its burden, "the non-moving party must show that summary judgment is inappropriate by setting 'forth specific facts showing the existence of a genuine issue concerning every essential component of its case.'"[21]  However, the non-moving party's burden "is not satisfied with some metaphysical doubt as to the material facts, by conclusory allegations, by unsubstantiated assertions, or by only a scintilla of evidence."[22]

---

[18] Fed. R. Civ. P. 56(a).
[19] *Delta & Pine Land Co. v. Nationwide Agribusiness Ins. Co.*, 530 F.3d 395, 398-99 (5th Cir. 2008).
[20] *Guerin v. Pointe Coupee Parish Nursing Home*, 246 F.Supp.2d 488, 494 (M.D. La. 2003)(quoting *Little v. Liquid Air Corp.*, 37 F.3d 1069, 1075 (5th Cir. 1994)(en banc)(quoting *Celotex Corp. v. Catrett*, 477 U.S. 317, 323-25, 106 S.Ct. at 2552)).
[21] *Rivera v. Houston Independent School Dist.,* 349 F.3d 244, 247 (5th Cir. 2003)(quoting *Morris v. Covan World Wide Moving, Inc.*, 144 F.3d 377, 380 (5th Cir. 1998)).
[22] *Willis v. Roche Biomedical Laboratories, Inc.,* 61 F.3d 313, 315 (5th Cir. 1995)(quoting *Little v. Liquid Air Corp.*, 37 F.3d 1069, 1075 (5th Cir. 1994).
37377

Notably, "[a] genuine issue of material fact exists, 'if the evidence is such that a reasonable jury could return a verdict for the nonmoving party.'"[23] All reasonable factual inferences are drawn in favor of the nonmoving party.[24] However, "[t]he Court has no duty to search the record for material fact issues. Rather, the party opposing the summary judgment is required to identify specific evidence in the record and to articulate precisely how this evidence supports his claim."[25] "Conclusory allegations unsupported by specific facts … will not prevent the award of summary judgment; 'the plaintiff [can]not rest on his allegations … to get to a jury without any "significant probative evidence tending to support the complaint."'"[26]

### B. Prescription

Per Woods' own admission in her *Opposition*, "the act of discrimination occurred when the accommodation granted by [Pierson], was later revoked by [Abney]."[27] Defendant argues that the act of revocation occurred in April of 2013, but "the Complaint was not filed until June 18, 2015, more than two years after this alleged discriminatory conduct."[28] The record reflects that the alleged "act of discrimination" occurred on either April 22, 2013 or April 24, 2013. The Defendant argues that, given Woods' argument that the act of discrimination was the conduct in April of 2013, "her claims related to that conduct are prescribed and should be dismissed."[29]

---

[23] *Pylant v. Hartford Life and Accident Insurance Company*, 497 F.3d 536, 538 (5th Cir. 2007)(quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986)).
[24] *Galindo v. Precision American Corp.*, 754 F.2d 1212, 1216 (5th Cir. 1985).
[25] *RSR Corp. v. International Ins. Co.*, 612 F.3d 851, 857 (5th Cir. 2010).
[26] *Nat'l Ass'n of Gov't Employees v. City Pub. Serv. Bd. of San Antonio, Tex.*, 40 F.3d 698, 713 (5th Cir. 1994)(quoting *Anderson*, 477 U.S. at 249).
[27] Rec. Doc. 20, p. 3.
[28] Rec. Doc. 21, p. 3.
[29] *Id.*
37377

The Fifth Circuit in *Frame v. City of Arlington* ruled on the statute of limitations period for the Rehabilitation Act. In examining the Rehabilitation Act, the court held: "When Congress does not establish a limitations period for a federal cause of action, the 'general rule' is that we borrow the most analogous period from state law."[30] *Frame* originated in a Texas federal district court, thus the Texas two-year personal-injury limitations period applied.[31] As the present case is in a Louisiana federal court, the Court will apply the limitations period under Louisiana personal-injury tort law.

In *Reeves v. Leblanc*, a Middle District of Louisiana case, the court found that "claims under Title II of the ADA and under the Rehabilitation Act are subject to the relevant state's limitations period for personal injury cases, and Louisiana Code of Civil Procedure article 3492 – Delictual actions are subject to a liberative prescription of one year."[32] The *Reeves* court further held that "the limitations period commences when the aggrieved party has either knowledge of the violation or notice of facts which, in the exercise of due diligence, would have led to actual knowledge thereof;"[33] "accrual occurs the moment the plaintiff becomes aware that he has suffered an injury or has sufficient information to know that he has been injured."[34]

Applying *Frame* and *Reeves* to the present case, it is clear that Woods' alleged act of discrimination occurred on either April 22, 2013 or April 24, 2013. Woods was actively participating in the conversations with Abney and Jones and was, therefore,

---

[30] 657 F.3d 215, 237 (5th Cir. 2011).
[31] *Id.*
[32] *Reeves v. Leblanc*, No. 13-586, 2016 WL 828744 at *2 (M.D. La. Feb. 8, 2016)(internal quotations omitted).
[33] *Id.* (quoting *Newman v. Coffin*, 464 Fed. Appx. 359, 362 (5th Cir. 2012)(quoting *Jensen v. Snellings*, 841 F.2d 600,606 (5th Cir. 1988).
[34] *Id.*
37377

acutely aware of any alleged injury giving rise to this cause of action. Accordingly, Woods' claim under the Rehabilitation Act must have been filed no later than April 24, 2014. Woods filed her *Complaint* on June 18, 2015 – well over a year after her claim arising from the 2013 alleged act of discrimination prescribed.[35]

Accordingly, NSU's *Motion for Summary Judgment* is proper and shall be GRANTED on prescription. Prescription notwithstanding, the Court finds that summary judgment on the merits is also proper.

### C. Interactive Process and Reasonable Accommodation

Woods claims that NSU failed to accommodate her disability by failing to engage in the deliberative process.[36] Plaintiff alleges that, beginning in January 2014, "[Jones], who had replaced [Pierson] as [Woods'] faculty and administrative supervisor, imposed a full duty release requirement upon [Woods], foreclosing any further discussion of accommodation of [Woods'] disability."[37]

As discussed above, Woods' Rehabilitation Act claim is based on actions that occurred before June 18, 2014 and are, thus, time barred. Woods could only escape dismissal by prescription if the continuing violation doctrine applied in this case. The Fifth Circuit in *Henrickson v. Potter* held that the continuing violation doctrine may apply to claims arising under the Rehabilitation Act; however, "Plaintiffs asserting continuing violations must demonstrate more than a series of discriminatory acts. They must show

---

[35] Because jurisprudence establishes that Meniere's disease was a disability prior to the 2008 ADA amendment, Woods' reliance on *Dickinson v. University of North Carolina* is misplaced, and her argument for a 4 year statute of limitations period is without merit. *See Carr v. Reno*, 23 F.3d 525, 530 (D.C. Cir. 1994)("the district court was correct to hold that there is no genuine issue of fact as to whether [plaintiff with Meniere's disease was a qualified individual with handicaps.")(internal quotations omitted).
[36] Rec. Doc. 20.
[37] *Id.*

37377

an organized scheme leading to and including a present violation such that it is the cumulative effect of the discriminatory practice, rather than any discrete occurrence, that gives rise to the cause of action."[38]  The plaintiff in *Henrickson* requested a custom chair on a single occasion.  The *Henrickson* court found that the plaintiff had "failed to meet the bare minimum of requirements for establishing a continuing violation."[39]

Woods has failed to illustrate any continued actions taken by NSU, much less an "organized scheme" with "the cumulative effect of [a] discriminatory practice."[40]  The only action Woods offers in support of her failure to engage in the deliberative process claim is that "Defendant concedes that in January [*sic*], 2014, and each subsequent semester [Jones] advised [Woods] that she would be placed on the schedule when she could commit to return to NSU with a medical release and willing to teach, at least in part, face to face classes."[41]  Viewing this contention in the light most favorable to Woods, she has failed to demonstrate an "organized scheme" resulting "in a discriminatory practice" as required by the Fifth Circuit to find a continuing violation under the Rehabilitation Act.[42]  The only specific date that Woods pinpoints relevant to this claim is January 2014; therefore, any claims under the Rehabilitation Act prescribed at the end of January 2015, and her *Complaint* was not filed until June 18, 2015.  Although Woods failed to even argue the continuing violation doctrine, she is nevertheless unavailed by the continuing violation doctrine as it does not save her claim from prescription.

In the alternative, if Woods had shown a continuing violation, the Court finds that

---

[38] 327 F.3d 444, 447 (5th Cir. 2003)(quoting, *Huckabay v. Moore*, 142 F.3d 233, 239 (5th Cir 1998).
[39] *Id*.
[40] *Id*.
[41] Rec. Doc. 20, p. 6.  Woods fails to attribute where NSU conceded the above quotation.
[42] *Henrickson*, 327 F.3d at 447 (5th Cir. 2003).
37377

the summary judgment evidence establishes that NSU engaged in the deliberative process. Under Fifth Circuit jurisprudence, "a plaintiff must prove the following statutory elements to prevail in a failure-to-accommodate claim: (1) the plaintiff is a qualified individual with a disability; (2) the disability and its consequential limitations were known by the covered employer; and (3) the employer failed to make reasonable accommodations for such known limitations."[43]

The Fifth Circuit in *EEOC v. LHC Group, Inc.* held that, "once the employee presents a request for an accommodation, the employer is required to engage in an interactive process so that *together* they can determine what reasonable accommodations might be available."[44] The employee in *LHC Group* reached out to her supervisor for help using computer programs due to her high medication level, and her "supervisor kept silent and walked away."[45] Given these facts, the Fifth Circuit reversed the district court's grant of summary judgment in favor of the employer because "a reasonable jury could find that the [employee] reached out to [LHC] for accommodation and was denied an interactive process."[46]

The conduct of NSU and LHC could not be more different. While LHC kept silent and walked away, NSU continually contacted Woods in an attempt to work toward a mutually agreeable whereby Woods could be away from campus for medical needs while also fulfilling her job responsibilities. The record demonstrates that Woods, not NSU, was entrenched in her position and failed to work with NSU to accomplish a mutually

---

[43] *Feist v. Louisiana, Dept. of Justice, Office of the Atty. Gen.*, 730 F.3d 450, 452 (5th Cir. 2013).
[44] 773 F.3d 688, 700 (5th Cir. 2014)(quoting *E.E.O.C. v. Chevron Phillips*, 570 F.3d 606, 622 (5th Cir. 2009).
[45] *Id.*
[46] *Id.*
37377

agreeable accommodation.[47]  NSU's communications with Woods establish that it did not remain silent once Woods presented her request for an accommodation – it offered a solution whereby Woods was able to be away for medical reasons and also perform her job.  Considering the evidence before the Court, the Court concludes that no reasonable jury could find that Woods reached out to NSU for an accommodation, and NSU failed to engage in an interactive process.

Furthermore, the accommodation that NSU proposed - hybrid face-to-face teaching with online classes when Woods needed to be away from campus for medical treatment - was the exact accommodation that Woods' physician suggested in 2013 when the original request for an accommodation was made: Woods "would benefit medically from hybrid teaching, part classroom and part online."[48]  NSU offered the very accommodation that Woods' physician suggested.  Woods essentially posits that NSU failed to make a reasonable accommodation because they did not accept any of her proposed accommodations.  Taken to its logical conclusion, Woods' argument suggests that any time an employer proposes an accommodation with which the employee disagrees the employer has failed to engage in the interactive process.  This is a legally untenable argument the Fifth circuit has clearly held that the employer and the employee must work together to find a reasonable accommodation.  The law is clear that, "'the ADA provides a right to *reasonable* **accommodation,** *not* to the **employee's *preferred* accommodation**.'"[49]  The evidence shows that NSU actively attempted to work with

---

[47] See Rec. Doc. 18-2, p. 10.  "I am prepared to continue here through January getting classes ready for switching to on-line OR canceling all classes and going on sick leave for this spring 2014 semester."
[48] *Id*.
[49] *Martel v. Evangeline Parish School Board*, No. 10-00878, 2012 WL 3637614, *8 (W.D. La. Aug. 21, 2012)(quoting *EEOC v. Agro Distrib.*, 555 F.3d 462, 471 (5th Cir. 2009)(emphasis in original)).
37377

Woods to find a reasonable accommodation, and Woods did nothing in return but present a series of accommodations agreeable to her alone.

Woods also suggests that NSU failed to engage in the deliberative process when it required a medical release in order for her to resume teaching face-to-face classes.[50] Woods stretches the argument that requiring "a medical release in order to return to work is the functional equivalent of a 100% healed policy, which is a *per se* violation of the ADA's requirement that the employer participate in the deliberative process."[51] Woods relies on *Barton v. Checkers Drive-In Restaurants, Inc.* in support of this argument.[52] However, *Barton* is factually distinguishable from the present case. The employer in *Barton* "perceived [plaintiff] as being disabled because she was not 100% healed and constructively discharged her by refusing to allow her to return to work absent medical proof of no restrictions."[53] Nothing in the present record indicates, aside from Woods' unattributed quote, that NSU required a medical release, much less a work release that would require Woods to be 100% healed. Reviewing the current record, the only medical documentation that NSU requested from Woods appears to be a letter from her physician detailing when and for how long she would need to be absent from NSU for medical treatment and testing.[54] Furthermore, Woods has been teaching face-to-face classes at NSU since Fall of 2015. The Court, therefore, finds that Woods' 100% healed work release argument in support of her failure to accommodate claim is not persuasive as the record indicates that NSU did not require a 100% healed work release, and the

---

[50] Rec. Doc. 20, p. 4.
[51] *Id* at p. 5.
[52] No. 11-186, 2011 WL 1193061 at *1 (E.D. La. Mar. 28, 2011).
[53] *Id*. at *3.
[54] *See* Rec. Doc. 18-7.
37377

jurisprudence offered is factually distinguishable from the present case.

Accordingly, NSU's *Motion for Summary Judgment* is GRANTED alternatively after a consideration on the merits.

## III.  CONCLUSION

For the foregoing reasons, NSU's *Motion for Summary Judgment*[55] is GRANTED. Plaintiff's case is dismissed with prejudice.

*Judgment* shall be entered accordingly.

Signed in Baton Rouge, Louisiana on February 13, 2017.

*(signature)*

**JUDGE SHELLY D. DICK**
**UNITED STATES DISTRICT COURT**
**MIDDLE DISTRICT OF LOUISIANA**

---

[55] Rec. Doc. 18.
37377